**FINA OIL AND CHEMICAL CO. and Fina Technology, Inc., Plaintiffs–Appellees,**

v.

**John A. EWEN, Defendant–Appellant,**

v.

**Abbas RAZAVI, Intervenor–Appellee.**

**No. 96–1179.**

United States Court of Appeals, Federal Circuit.

Sept. 2, 1997.

William D. Harris, Jr., Harris, Tucker & Hardin, Dallas, TX, argued, for plaintiffs-appellees. With him on the brief was Roy W. Hardin. Of counsel on the brief were Robert H. Mow, Jr. and David H. Judson, Hughes & Luce, L.L.P., Dallas TX.

Jim L. Flegle, Bracewell & Patterson, L.L.P, Dallas, TX, argued, for defendant-appellant. With him on the brief was Gregory J. Sachnik, Dallas, TX.

David L. Joers, Crutsinger & Booth, Dallas, TX, argued, for intervenor-appellee. With him on the brief were John F. Booth and Todd E. Albanesi, Dallas, TX. Of counsel was Kevin L. Smith.

Before ARCHER, Chief Judge, MICHEL, and CLEVENGER, Circuit Judges.

CLEVENGER, Circuit Judge.

The United States District Court for the Northern District of Texas determined on summary judgment that Dr. Abbas Razavi is the sole inventor of the subject matter of U.S. Patent No. 4,892,851 (the '851 patent), owned by Fina Oil & Chemical Co. and Fina Technology, Inc. (collectively Fina). The court also directed Fina to seek correction of the '851 patent by removing Dr. John A. Ewen as a named inventor. We hold that the district court applied the wrong legal standard in determining Dr. Ewen's contribution to the subject matter claimed in the '851 patent, and that under the proper standard, there exist genuine issues of material fact regarding inventorship. We therefore vacate and remand.

I

The '851 patent lists Drs. Ewen and Razavi as co-inventors and discloses a metallocene catalyst used to produce syndiotactic polypropylene (SPP) and methods for making the catalyst. A metallocene compound is formed by chemically combining an organic ligand with a metal. Specifically, the patent describes and claims two methods for making a syndiospecific metallocene catalyst.[1] The first method, known as Method A, synthesizes a catalyst using the metal tetrachloride-THF complex and a ligand which is prepared using fluorene, methyl lithium and 6,6-dimethylfulvene. In the second method, known as Method B, the ligand is dissolved in a non-coordinating solvent, such as pentane, toluene or methylene chloride.[2]

Dr. Ewen began working for Fina in 1984 and started efforts to produce syndiospecific metallocene catalysts as early as 1985 or 1986. According to his summary judgment submissions and reasonable inferences therefrom, in 1986, Dr. Ewen, with the assistance of Fina technician Michael Elder, produced a complex that was similar to, but not the same as, the catalyst claimed in the '851 patent. In June 1987, Fina technician Larry Jones, acting under Dr. Ewen's direction, purportedly performed the process described as Method A in the '851 patent to synthesize the ligand used to make the claimed catalysts (hereinafter "the Jones experiment"). However, Jones never determined for certain whether he had produced the desired ligand because under Dr. Ewen's instruction, he

---

1. The catalyst is referred to as syndiospecific because its use in a reaction results in the formation of syndiotactic polypropylene. Syndiotactic polypropylene has certain desirable physical properties not exhibited by other types of polypropylene, such as atactic and isotactic polypropylene.

2. The only independent product claim is claim 1, which reads:
   A metallocene catalyst for use in preparing syndiotactic polyolefins, said catalyst described by the formula $R''(C_pR_n)(C_pR'_m)MeQ_k$ wherein each $C_p$ is a cyclopentadienyl or substituted cyclopentadienyl ring; each $R_n$ is the same or different and is a hydrocarbyl radical having 1–20 carbon atoms; each $R'_m$ is the same or different and is a hydrocarbyl radical having 1–20 carbon atoms; $R''$ is a structural bridge between the $C_p$ rings imparting stereorigidity to the catalyst; Me is a group 4b, 5b, or 6b metal from the Periodic Table of Elements; each Q is a hydrocarbyl radical having 1–20 carbon atoms or is a halogen; $0 \leq k \leq 3$; $0 \leq n \leq 4$; $1 \leq m \leq 4$; and wherein $R'_m$ is selected such that $(C_pR'_m)$ is a sterically different ring than $(C_pR_n)$.

treated the substance he had produced with hydrochloric acid, and it was destroyed as a result.

In early September 1987, Fina hired Dr. Razavi, and Dr. Ewen assigned the catalyst project to him. On October 21, 1987, Dr. Razavi successfully synthesized the ligand. Within a month, Dr. Razavi also synthesized a syndiospecific hafnium catalyst and a zirconium metallocene catalyst. In March 1988, Dr. Razavi successfully synthesized a metallocene catalyst using a methylene chloride noncoordinating solvent (*i.e.,* Method B of the '851 patent). It is undisputed that Dr. Razavi's experiments actually resulted in the catalysts disclosed and claimed in the '851 patent. The parties, however, hotly dispute Dr. Ewen's role in the experiments and Dr. Razavi's inventive contribution to the experiments' success.

Soon after Dr. Razavi's successful synthesis of the metallocene catalysts, Dr. Ewen and Dr. Razavi became mutually contentious, each claiming that he was the sole inventor of the subject matter claimed in the '851 patent and that the other stole the credit for the invention. As their relationship began to deteriorate, Dr. Ewen submitted an invention disclosure to Fina's outside patent counsel with a detailed description of the procedure for making the ligand and catalyst as performed by Dr. Razavi, and successful polymerization tests that showed the catalysts were useful for producing SPP. That disclosure led to the filing, on July 15, 1988, of the patent application that matured into the '851 patent. Both Dr. Ewen and Dr. Razavi signed the joint assignment for the application and the declaration under penalty of perjury. In 1989, Dr. Razavi resigned from Fina.

In 1990, Dr. Ewen and Fina became embroiled in a lawsuit in Texas state court against Exxon Corporation, Dr. Ewen's previous employer. Exxon brought suit claiming that Dr. Ewen disclosed Exxon's confidential information to Fina, and used that information to apply for patents claiming subject matter that belonged to Exxon. Dr. Ewen filed a cross-claim against Fina, seeking, *inter alia,* to have a constructive trust placed on the proceeds from technology covered by the '851 patent. During discovery in the state court suit, Fina learned of Dr. Ewen's contention that several patents and patent applications relating to the SPP technology had various inventorship defects and other statutory defects. In December 1993, Fina brought this action in federal court to correct the inventorship, under 35 U.S.C. § 256, of several patents issued to inventors other than Razavi and Ewen relating to SPP technology. With respect to several other related patents, including the '851 patent, Fina asked for a declaratory judgment that inventorship was properly recorded or, alternatively, for correction of inventorship under section 256. Dr. Ewen filed a motion to dismiss for lack of subject matter jurisdiction, which the court denied.

The state court case was settled among Exxon, Fina, and Dr. Ewen, and dismissed on May 5, 1995. In the meantime, the federal district court had ruled on partial summary judgment that Dr. Razavi was at least a co-inventor of the technology claimed in the '851 patent. Dr. Razavi subsequently intervened in this action and moved for partial summary judgment that he was the sole inventor of the subject matter claimed in the '851 patent. After the settlement of the state court case, the federal district court granted Dr. Razavi's motion. The court then denied Dr. Ewen's motion for reconsideration, and, after the parties entered into stipulations regarding the remaining claims, entered a final judgment on January 22, 1996. Dr. Ewen appeals.

## II

■ Before we may examine the merits of this case, we must consider a challenge by Dr. Ewen to the district court's jurisdiction. Dr. Ewen argues that the district court did not have jurisdiction over Fina's declaratory judgment claim because Fina had no reasonable apprehension that Dr. Ewen would bring a suit for infringement of the '851 patent and therefore there was no jurisdiction-conferring "actual controversy." [3]

---

**3.** Because this issue "clearly implicates the jurisprudential responsibilities of this court in a field within [our] exclusive jurisdiction, i.e., patent law, ... we are not bound by decisions of the regional circuit courts." *Gardco Mfg., Inc. v. Herst Lighting Co.,* 820 F.2d 1209, 1212, 2 USPQ2d 2015, 2018 (Fed.Cir.1987).

■ Because the federal courts do not sit to render advisory opinions, the Declaratory Judgment Act, 28 U.S.C. § 2201 (1994), "requires an actual controversy between the parties before a federal court may exercise jurisdiction over an action for a declaratory judgment." *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 810, 39 USPQ2d 1451, 1453 (Fed. Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 789, 136 L.Ed.2d 730 (1997); *see Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 239–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937). A declaratory judgment action permits a threatened party to resolve its potential liability, but only when the situation has progressed to an actual controversy, as required by Article III of the Constitution. *Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha,* 57 F.3d 1051, 1053, 35 USPQ2d 1222, 1223 (Fed.Cir.1995). Thus, a declaratory judgment action affords a measure of relief to a party who is under the shadow of threatened litigation arising under federal law. *See Serco Servs. Co. v. Kelley Co.,* 51 F.3d 1037, 1038, 34 USPQ2d 1217, 1218 (Fed.Cir. 1995). "The declaratory plaintiff need only satisfy the jurisdictional requirement 'that the conflict be real and immediate, i.e., that there be a true, actual "controversy" required by the Act.'" *Id.* (*quoting Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 735, 6 USPQ2d 1685, 1688 (Fed. Cir.1988)).

■ We determine whether there is jurisdiction in a declaratory judgment action by applying the *well-pleaded complaint rule.* *See Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 672, 70 S.Ct. 876, 879, 94 L.Ed. 1194 (1950). We apply that rule not to the declaratory judgment complaint but to the hypothetical action the declaratory defendant would have brought. *Cedars–Sinai Med. Center v. Watkins,* 11 F.3d 1573, 1578, 29 USPQ2d 1188, 1192 (Fed.Cir.1993).

In the classic patent declaratory judgment suit, *i.e.,* where the declaratory plaintiff is laboring under the threat of litigation for alleged infringement of a patent, the "actual controversy" requirement means that there is jurisdiction over the action if: (1) the declaratory plaintiff has acted, or has made preparations to act, in a way that could constitute infringement, and (2) the patentee has created in the declaratory plaintiff a reason-able apprehension that the patentee will bring suit if the activity in question continues. *See EMC Corp.,* 89 F.3d at 811, 39 USPQ2d at 1453–54; *Arrowhead,* 846 F.2d at 736, 6 USPQ2d at 1688–89. Satisfaction of this traditional two-part test is not, however, a prerequisite to jurisdiction in every possible patent declaratory judgment action. Indeed, the two elements merely assure that the declaratory plaintiff has enough interest in the subject matter of the suit and that the disagreement between the parties is real and immediate enough to fulfill the "actual controversy" requirement.

■ Here, the action was brought for a declaration that the inventors were properly named on the '851 patent in accordance with 35 U.S.C. § 116 (1994). Under the well-pleaded complaint rule, we look to the corresponding action that Dr. Ewen would have brought, *i.e.,* an action for correction of inventorship under 35 U.S.C. § 256 (1994). *See Cedars–Sinai,* 11 F.3d at 1578, 29 USPQ2d at 1192 ("After constructing a hypothetical complaint that otherwise would have been filed by the declaratory judgment defendant, this court's jurisdictional onus is then to determine both under which federal statute(s) the hypothetical cause of action would have 'aris[en],' and whether those federal statute(s) 'relat[e] to' patents, while staying ever loyal to the Supreme Court's guidance in *Christianson* [*v. Colt Indus. Operating Corp.,* 486 U.S. 800, 808, 108 S.Ct. 2166, 2173, 100 L.Ed.2d 811 (1988) ]."). Section 256 reads:

Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent and such error arose without any deceptive intention on his part, the Commissioner may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error.

The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section. The court before which such matter is called in question may order

correction of the patent on notice and hearing of all parties concerned and the Commissioner shall issue a certificate accordingly.

This section provides a cause of action to interested parties to have the inventorship of a patent changed to reflect the true inventors of the subject matter claimed in the patent. A patentee or its assignee may state a claim under this section even where there is not a consensus on the correct inventorship as long as all parties are given notice and an opportunity to be heard. *See MCV, Inc. v. King–Seeley Thermos Co.*, 870 F.2d 1568, 1570, 10 USPQ2d 1287, 1289 (Fed.Cir.1989).

■ We hold that a declaratory plaintiff may establish an actual controversy in this context by averring: (1) that it holds a recognized interest in a patent that could be adversely affected by an action brought under section 256, and (2) another party with a right to bring an action under section 256 has created in the declaratory plaintiff a reasonable apprehension that it will do so. This standard respects the constitutional requirement of an actual controversy. The declaratory plaintiff's interest in the patent, coupled with its reasonable apprehension of suit, ensures that the parties to the declaratory suit are adverse and that their dispute is sufficient in character to create an actual controversy. *See Public Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 244, 73 S.Ct. 236, 240, 97 L.Ed. 291 (1952) ("The disagreement must not be nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them.").

The standard also parallels our case law in traditional declaratory judgment cases relating to patent validity. A reasonable apprehension of suit is required under both rules. In addition, the requirement that the declaratory plaintiff have an interest in the patent is analogous to the requirement that a de-

claratory plaintiff act or threaten to act in a way that would constitute infringement. Both ensure that the declaratory plaintiff has a true stake in the controversy. *See BP Chems. Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 977–78, 28 USPQ2d 1124, 1126 (Fed.Cir. 1993) (stating that the purpose of the traditional two-part test is to determine if the need for judicial attention is real and immediate or merely prospective and uncertain).

Applying the standard stated above to the facts of this case, we cannot say that the district court legally erred in finding an actual controversy, nor, once it found an actual controversy, that the court abused its discretion in exercising jurisdiction.[4] As the owner of the '851 patent, Fina clearly has a recognized interest in the patent that could be adversely affected by a section 256 action. For instance, if the inventors are properly named on the patent, Fina has no concerns about invalidity of the patent over inventorship problems. In contrast, if a party were to succeed in changing the inventorship of the patent, Fina would be exposed to future charges that the initial inventors were improperly named. Fina also had a reasonable apprehension that Dr. Ewen would bring a section 256 action to correct inventorship. At the time Fina filed this action, the parties were ensnared in a state court dispute in which serious charges had been made concerning inventorship and assignment with respect to the '851 patent. In particular, Dr. Ewen alleged in the state court case that Fina had improperly added Dr. Razavi to the patents covering metallocene catalysts, including the '851 patent.

Finding jurisdiction in this case is not inconsistent with *Speedco, Inc. v. Estes*, 853 F.2d 909, 7 USPQ2d 1637 (Fed.Cir.1988), a case for a declaratory judgment of invalidity which was cited by Dr. Ewen in his brief and at oral argument. In that case, the court determined that the declaratory defendant's hypothetical action did not "arise under" the

---

4. *See Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 634, 19 USPQ2d 1545, 1547 (Fed.Cir. 1991) ("When there is no actual controversy, the court has no discretion to decide the case. When there is an actual controversy and thus jurisdiction, the exercise of that jurisdiction is discretionary."); *see also BP Chems.*, 4 F.3d at

978, 28 USPQ2d at 1127 ("Whether an actual controversy exists upon particular facts is a question of law, and is subject to plenary appellate review. The district court's factual findings pertinent thereto are reviewed for clear error, in accordance with Fed.R.Civ.P. 52(a)." (Citations omitted)).

federal patent law because the declaratory defendant did not have a colorable claim of ownership in the subject patent and therefore had no right to sue for patent infringement. 853 F.2d at 912, 7 USPQ2d at 1640. The declaratory defendant's only other possible claim was for breach of a contract relating to a patent, which would not have required the declaratory defendant to plead patent validity as a necessary element of the complaint. *Id.* The court thus concluded that the declaratory plaintiff could not establish jurisdiction under the well-pleaded complaint rule. *Id.* In contrast, the action Dr. Ewen would have brought here is an action for correction of inventorship under section 256, clearly an action "arising under" the patent laws that could secure federal question jurisdiction. *See MCV, Inc.,* 870 F.2d at 1570, 10 USPQ2d at 1289.

■ Dr. Ewen asserts that we must look to his state court claim (for a constructive trust), rather than section 256, to form the hypothetical declaratory judgment claim. Dr. Ewen argues that under that standard, his hypothetical claim does not "arise under" the patent laws. The state law claims are relevant because they inform our inquiry into whether Fina had a reasonable apprehension that Dr. Ewen might have brought a section 256 action. Dr. Ewen's assertion that only the actual state claims themselves may be used to form the declaratory defendant's hypothetical claims is, however, simply wrong.

Dr. Ewen's proffered assertion, *i.e.*, that the hypothetical declaratory judgment claim may be based only on the actual claim brought in state court, would gut the Declaratory Judgment Act. His analysis would limit the declaratory defendant's hypothetical claim under the well-pleaded complaint rule to claims already brought in state court. This would assure a lack of federal jurisdiction in almost all cases in which the declaratory defendant has made a state law claim. If a federal claim is made in the state court action, removal is the appropriate route; where there is no federal claim, the declaratory plaintiff is not limited to the actual claims made in the state court. *See Goodyear Tire & Rubber Co. v. Releasomers, Inc.,* 824 F.2d 953, 955, 3 USPQ2d 1310, 1312 (Fed.Cir.1987) (finding a reasonable appre-

hension of suit from a state trade secret suit between the parties concerning the technology covered by the patents in the federal suit); *C.R. Bard, Inc. v. Schwartz,* 716 F.2d 874, 881, 219 USPQ 197, 203 (Fed.Cir.1983) (explaining that a state suit brought by a patentee for breach of a license agreement showed the patentee's willingness to enforce its patent rights and was a factor in creating a reasonable apprehension of suit in the declaratory plaintiff).

On the question of the district court's jurisdiction, we also note that Fina itself sought more than a declaration of correct inventorship. It alternatively sought correction of inventorship. The district court, therefore, had jurisdiction on that basis as well. *See MCV, Inc.,* 870 F.2d at 1570, 10 USPQ2d at 1289.

### III

■ We next consider the district court's grant of summary judgment on the issue of inventorship. Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). "Thus, summary judgment may be granted when no 'reasonable jury could return a verdict for the nonmoving party.'" *O.I. Corp. v. Tekmar Co.,* 115 F.3d 1576, 1580, 42 USPQ2d 1777, 1779 (Fed.Cir. 1997) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The standard of proof on an issue must be considered when evaluating the sufficiency of the evidence on a motion for summary judgment. *See National Presto Indus., Inc. v. West Bend Co.,* 76 F.3d 1185, 1189, 37 USPQ2d 1685, 1687 (Fed.Cir.1996) (*citing Anderson,* 477 U.S. at 254, 106 S.Ct. at 2513). There is a presumption that the inventors named on an issued patent are correct, so misjoinder of inventors must be proven by clear and convincing evidence. *Hess v. Advanced Cardiovascular Sys., Inc.,* 106 F.3d 976, 979–80, 41 USPQ2d 1782, 1785–86 (Fed.Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 2459, 138 L.Ed.2d 216,. (1997); *see Carter v. Kellgren,* 35 C.C.P.A. 989, 166 F.2d 592, 595, 77 USPQ 102, 104 (CCPA 1948). We review *de novo* a district

court's grant of summary judgment. *Ekchian v. Home Depot Inc.*, 104 F.3d 1299, 1302, 41 USPQ2d 1364, 1366 (Fed.Cir.1997).

■■■■ Conception is the touchstone to determining inventorship. *See Sewall v. Walters*, 21 F.3d 411, 415, 30 USPQ2d 1356, 1358 (Fed.Cir.1994). Conception of a chemical substance requires knowledge of both the specific chemical structure of the compound and an operative method of making it. *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1229, 32 USPQ2d 1915, 1921 (Fed. Cir.1994). The issue of joint inventorship is governed by 35 U.S.C. § 116, which states, in relevant part:

> When an invention is made by two or more persons jointly, they shall apply for patent jointly and each make the required oath, except as otherwise provided in this title. Inventors may apply for a patent jointly even though (1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, or (3) each did not make a contribution to the subject matter of every claim of the patent.

This provision sets no explicit lower limit on the quantum or quality of inventive contribution required for a person to qualify as a joint inventor. Rather, a joint invention is simply the product of a collaboration between two or more persons working together to solve the problem addressed. *Burroughs Wellcome*, 40 F.3d at 1227, 32 USPQ2d at 1919. The determination of whether a person is a joint inventor is fact specific, and no bright-line standard will suffice in every case.[5]

■■■■ Nonetheless, our precedent provides guidance as to what types of acts are, or are not, sufficient in quantum and quality to establish joint inventorship. One need not alone conceive of the entire invention, for this would obviate the concept of joint inventorship. However, a joint inventor must contribute in some significant manner to the conception of the invention. *See Pro–Mold & Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1575, 37 USPQ2d 1626, 1632 (Fed. Cir.1996) (citing *Sewall*, 21 F.3d at 415, 30 USPQ2d at 1358–59). As such, "each inventor must contribute to the joint arrival at a definite and permanent idea of the invention as it will be used in practice." *Burroughs Wellcome*, 40 F.3d at 1229, 32 USPQ2d at 1921.

■■■■ If a person supplies the required quantum of inventive contribution, that person does not lose his or her status as a joint inventor just because he or she used the services, ideas, and aid of others in the process of perfecting the invention. *See Shatterproof Glass Corp. v. Libbey–Owens Ford Co.*, 758 F.2d 613, 624, 225 USPQ 634, 641 (Fed.Cir.1985). However, those others may also in appropriate circumstances become joint inventors by their contributions. In addition, a person is not precluded from being a joint inventor simply because his or her contribution to a collaborative effort is experimental. *See Burroughs Wellcome*, 40 F.3d at 1229, 32 USPQ2d at 1921.

■■■■ The basic exercise of the normal skill expected of one skilled in the art, without an inventive act, also does not make one a joint inventor. *See Sewall*, 21 F.3d at 416, 30 USPQ2d at 1359. Therefore, a person will not be a co-inventor if he or she does no more than explain to the real inventors concepts that are well known and the current state of the art. *See Hess*, 106 F.3d at 981, 41 USPQ2d at 1787. The case law thus indicates that to be a joint inventor, an individual must make a contribution to the conception of the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention.

■■■■ In reaching its conclusion that Dr. Ewen is not a joint inventor of the subject matter claimed in the '851 patent, the district court relied on the doctrine of simultaneous conception and reduction to practice. That doctrine states that in some instances, an inventor may only be able to establish a conception by pointing to a reduction to practice through a successful experiment. *See Amgen Inc. v. Chugai Pharmaceutical Co.*, 927 F.2d 1200, 1206, 18 USPQ2d 1016, 1021 (Fed.Cir.1991). Applying the doctrine, the

---

5. Conception and inventorship are questions of law, reviewed *de novo*, that rest on underlying facts. *See Sewall*, 21 F.3d at 415, 30 USPQ2d at 1358.

district court looked to the 1987 Jones experiment as a potential reduction to practice that could be used to establish Dr. Ewen's conception. Because the product of that experiment was destroyed before it could be analyzed, however, the court found insufficient evidence that there had been a reduction to practice or a conception by Dr. Ewen.

■■■ The district court's analysis of joint inventorship in this case effectively required Dr. Ewen to show that he was the sole inventor of the '851 patent. That was error. The doctrine of simultaneous conception and reduction to practice applies to the conception of the entire invention. Thus, it is applied in priority disputes to determine priority of conception as between one patent or application and another application. *See, e.g., Burroughs Wellcome,* 40 F.3d at 1229, 32 USPQ2d at 1920; *Amgen,* 927 F.2d at 1206, 18 USPQ2d at 1021; *Smith v. Bousquet,* 27 C.C.P.A. 1136, 111 F.2d 157, 162, 45 USPQ 347, 352 (CCPA 1940); *see also* 3 Donald S. Chisum, *Chisum on Patents* § 10.04[5] (1997). Conception and reduction to practice of the entire claimed invention may be relevant to establish that a first person conceived of an invention before another person entered the scene, and that the first person is therefore the sole inventor. However, *the doctrine cannot be used,* as the district court did here, to show that because the first person did not conceive or reduce to practice the entire claimed invention, he or she did not at least contribute in some significant way to the ultimate conception.

■■■ Of course, every putative inventor must nonetheless provide corroborating evidence of any asserted contributions to the conception of the invention. Like conception of the entire invention, a contribution to conception is a mental act which cannot be accurately verified without corroboration. *See Price v. Symsek,* 988 F.2d 1187, 1194, 26 USPQ2d 1031, 1036–37 (Fed.Cir.1993); *Linkow v. Linkow,* 517 F.2d 1370, 1373, 186 USPQ 223, 225 (CCPA 1975).

In this case, there are clearly genuine disputes about whether the respective contributions of Dr. Ewen and Dr. Razavi to the claimed invention were not insignificant in character. For example, there is a dispute over what was produced by the Jones experiment, and thus a dispute over whether that experiment helps prove that Dr. Ewen made some inventive contribution to the conception of the invention. The parties also dispute the roles of Dr. Ewen and Dr. Razavi in selecting methylene chloride as a chlorinated solvent. In addition, there is a dispute concerning the level of collaboration between Dr. Ewen and Dr. Razavi.

Thus, it is unclear from the record before us whether Dr. Ewen, through his experimentation conducted before hiring Dr. Razavi and his subsequent alleged collaboration with Dr. Razavi, made some not insignificant contribution to the conception of the invention. Any party wishing to challenge the '851 patent's current inventorship must ultimately come forward with clear and convincing evidence of facts that support its contentions. Dr. Razavi did not meet his burden of establishing undisputed facts to show that Dr. Ewen made no contribution to the conception of the invention claimed in the '851 patent or a contribution that was qualitatively insignificant. Dr. Ewen also averred facts that could establish his contribution to the conception of the claimed invention. We therefore vacate the summary judgment and remand for further proceedings consistent with this opinion. We have reviewed Dr. Ewen's other arguments—among others, those relating to the August 12, 1994 Order of the district court and his motion for reconsideration—and find them without merit.

No costs.

*VACATED AND REMANDED.*