Jaswant S. **PANNU** and Jaswant S. **Pannu, M.D., P.A.,** Plaintiffs,

v.

**IOLAB CORPORATION,** Defendant.

No. 93–6076–CIV–FERGUSON.

United States District Court,
S.D. Florida.

Jan. 31, 2000.

Robert J. Vander Wall, Stein Pendorf & Van Der Wall, Miami, FL, for Jaswant S. Pannu, plaintiffs.

Eric Christu, Elk Bankier Palmer & Christu, Boca Raton, Florida, Harry J. Roper, Raymond N. Nimrod, Aaron A. Barlow, Roper & Quigg, Chicago, IL, for Iolab Corporation, defendant.

### ORDER ON PLAINTIFFS' MOTION FOR JUDGMENT AS A MATTER OF LAW

FERGUSON, District Judge.

This patent infringement case came before the court a second time for trial after the first judgment entered on a jury verdict, finding that Iolab Corporation ("Iolab") had infringed on Jaswant S. Pannu and Jaswant S. Pannu, M.D., P.A.'s ("Dr.Pannu") patent, was vacated and remanded by the United States Court of Appeals. The appellate court held that this court "erred by not sending the inventorship issue to the jury." Dr. Pannu's concession that he and Dr. William Link ("Dr.Link") discussed the invention and that Dr. Link contributed the idea of one-piece construction for the intraocular lens was held sufficient evidence for a reasonable jury to find that Dr. Link (a nonparty) was an actual inventor. Other factors regarding the significance of Dr. Link's contribution and the timeliness of the claim were not considered obviously because they had not been articulated by this court as grounds for deciding the inventorship issue as a matter of law.

After a full presentation of all the evidence before a jury the inventorship issue is again decided as a matter of law because no reasonable jury could find the evidence clear and convincing that Dr. Link was an inventor. As will be clearly shown from the facts presented at trial, summarized in the following paragraphs. Iolab's affirmative defense of co-inventorship devoid of merit.

### STANDARD OF PROOF

A patent is presumed to be valid. 35 U.S.C. § 282. A party challenging the validity of a patent has the burden of proving its case with evidence that is clear and convincing. *Ryco, Inc. v. Ag–Bag Corp.*, 857 F.2d 1418, 1423 (Fed.Cir.1988); *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1549 (Fed.Cir.1983). There is a presumption that the inventors named on an issued patent are correct, so misjoinder of inventors must be proven by clear and convincing evidence. *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 979–80 (Fed.Cir.), *cert. denied*, 520 U.S. 1277, 117 S.Ct. 2459, 138 L.Ed.2d 216 (1997). Where a party has been fully heard on an issue in a jury trial, and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may grant a motion for judgment as a matter of law against that party on that issue. Fed.R.Civ.P. 50(a). Where the standard of proof is "clear and convincing," the trial judge in disposing of a directed verdict motion under Rule 50(a) should consider whether a reasonable fact finder could conclude that the nonmoving party has proved its case

with convincing clarity. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A party who has been unable to produce evidence such that a reasonable jury might find that the elements of an issue have been shown with "convincing clarity," where the standard of proof on that issue is clear and convincing evidence, may have judgment entered against it as a matter of law. *Anthony Distribs., Inc. v. Miller Brewing Co.*, 941 F.Supp. 1567 (M.D.Fla.1996).

In ruling on a motion for judgment as a matter of law, where the evidentiary burden upon the non-moving party is to prove its case by evidence that is clear and convincing, the court must accept as true evidence produced by that party with "convincing clarity," and all reasonable inferences to be drawn from that evidence. Such evidence must be accepted as true, even though there may be substantial evidence to the contrary. However, when a claim or defense cannot be maintained or defeated without a favorable finding on a material issue, and there is insufficient evidence to support that finding, the court must render a judgment as a matter of law against the party having the burden of proving that issue. *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1348 (Fed. Cir.1998).

## FACTS

A full history of this case is set out in *Pannu v. Iolab Corp.*, 155 F.3d 1344 (Fed. Cir.1998). Facts relevant to the issue of inventorship to be retried are as follows.

In early 1980, Dr. Pannu conceived an idea for reducing the possibility that the free ends of the haptics on an intraocular lens ("IOL") being surgically implanted or extracted might snag or tear eye tissue during the operation. Dr. Pannu's idea was that the haptics could be made "snag resistant" by bending the free ends around to form closed rings or large, circular loop-type structures or coils. In April, 1980, he applied for a patent on his invention. Markman Exhibit I is the prosecution history for that application. The application disclosed and broadly claimed a posterior chamber intraocular lens. It did not specify whether the lens was of single piece or multiple piece construction, although it did suggest various materials for making the optic and the haptics. Some materials commonly used for making the lens body, the optic and the loop extensions, the haptics, could not be used for both. However, at least one material, polymethyl methacrylate, PMMA, was suitable for both the optics and the haptics, and had been used in the manufacture of single piece IOLs.

Of significance are claims 1 and 10 of the application, which read as follows:

> Claim 1. An artificial intraocular lens comprising a posterior chamber lens provided with opposed superior and inferior loop members wherein each loop member includes a knee portion and an end portion shaped in the form of a circular structure.

> Claim 10. The lens of claim 1 wherein the loops are clear.

On November 18, 1980, the Patent and Trademark Office ("PTO") rejected all claims of the application. In that Office Action, the patent examiner rejected claim number 10 as having been anticipated by U.S.Patent No. 4,174,543 to Kelman. That patent discloses a lens made from a single piece of material, that is, a single piece lens. The examiner's remarks accompanying that rejection state that Kelman discloses that his lens may be used in the anterior or posterior chamber. The significance of the Section 102 rejection based upon Kelman is that the patent examiner concluded that every element of the lens claimed in the patent claim was present in the single Kelman prior art reference.

It is clear that the original Dr. Pannu claim concerned all lenses, whether of single piece or multiple piece construction. In other words Dr. Pannu's original patent claim was not limited to multiple-piece lenses but also encompassed single-piece lenses within its scope. It is equally clear that the concept of single piece construction of IOLs for use in the posterior chamber was taught by Kelman.

In July, 1980, Precision Cosmet, an IOL manufacturer, made a multiple-piece lens for Dr. Pannu that incorporated Dr. Pannu's idea for a ring at the end of each haptic. Dr. Pannu successfully implanted the lens in July. Later in 1980 Dr. Pannu sent letters to several manufacturers looking to have his invention produced and marketed. One of those manufacturers was Heyer–Schulte, a division of American Supply Corporation ("AHS") where Dr. Link was president. In the fall of that year Heyer–Schulte invited Dr. Pannu to its California office to discuss the lens. Dr. Link testified that "when Dr. Pannu came to us with his idea, it occurred to me that we could use [Heyer–Schulte's] new tumble polishing technology to manufacture the lens out of single piece rather than a multi-piece." He added that after further discussions and production of prototype designs for Dr. Pannu's lens Heyer–Schulte decided it could be profitable to do business with him:

Q. Did you and Doctor Pannu reach an agreement where you actually did make the single piece lens?

A. Yes. Following the meeting in Southern California then we designed a couple of styles of lenses for Doctor Pannu. They were single piece and using the tumble polishing process.

And upon looking at the individual styles Doctor Pannu and Heyer–Schulte selected the one that we thought looked like it would perform the best. Then we made a number of lenses for Doctor Pannu to be of implant quality so he can use them to implant and evaluate them in people.

Dr. Link's October 28, 1980, memorandum of the meeting with Dr. Pannu devotes a full paragraph to a description of the back-and-forth negotiations for a license royalty, and two paragraphs to Dr. Link's intended follow up ("we need to get him signed up as a clinical investigator; I will come to Florida where we can iron out the essence of a license agreement"). A single sentence was devoted to their discussion of single piece construction: "We talked about a concept of making the lens out of a single piece of plexiglass in a similar fashion to the way we are making the Leiske lens." This comment also confirms that single piece construction had been known in the art and utilized by Heyer–Schulte at the time of the meeting.

What followed for the next 2 to 3 years was a skirmish over licensing rights where Dr. Link's claim of co-inventorship was used as leverage in ensuing negotiations. The claim of possible co-inventorship came near the end of the negotiations as reflected in a letter sent to Dr. Pannu in early 1984. Finally an agreement was reached with Heyer–Schulte where Dr. Pannu was recognized as the sole inventor of the patented device. At least one of the letters confirms that Heyer–Schulte's patent attorney. Larry Barger ("Barger"), who had represented Dr. Link in filing of his patents, drafted the letter of intent to recognize Dr. Pannu as the inventor. The letter also reflects that the plan was submitted to Dr. Link, as president of Heyer–Schulte, for approval. Barger also drafted the amendment to Dr. Pannu's original application to insure a "positive outcome" in the prosecution of the patent because he had doubt that Dr. Pannu's attorney had sufficient expertise. On direct examination Dr. Link attempted to create doubt whether a claim of co-inventorship had been bargained away:

Q. By the way, had you reviewed Doctor Pannu's patent application before he filed it?

A. Not that I recall.

Q. Now, we have seen these four letters. Did you work out an arrangement with Doctor Pannu [to] resolve this particular issue?

A. Yes. We were at the same time period trying to finally establish an actual licensing agreement between Doctor Pannu and American Medical Optics, and I think within a few months after this exchange of letters, we were able to establish a business relationship that was acceptable to both of us.

Q. At that time did you give up your contention that you were a joint inventor of the single piece lens?

A. I don't believe so.

Nevertheless it is clear that as part of the agreement Dr. Link, on behalf of the corporation, agreed to underwrite the expenses of Dr. Pannu's patent application for a one-piece lens.

In the last paragraph of one of the letters which led to a licensing agreement, Richard Myers ("Myers"), another of Heyer–Schulte's patent attorneys wrote "[i]n the interest of a fair and equitable working relationship with Doctor Pannu, we have intentionally avoided asserting this [co-inventorship] position." During cross-examination Dr. Link was questioned about that paragraph in the letter:

Q. Who made the decision not to intentionally assert whatever position Mr. Myers was referring to?

A. Well, it was a joint decision. I certainly would have participated in that. We were very focused on making it practice not to conflict with our customers and ophthalmologists over those type of matters.

Q. You were giving up on the issue of joint inventorship in order to get a license agreement, were you not?

A. Is that asking for a legal opinion on my part?

Q. No.

A. We were. It states and our actions indicate that we did not assert the joint inventorship against Dr. Pannu at the time. We were trying to build lenses, come to a licensing agreement and to be able to continue to sell-make and sell the lenses. That was my business objective. We were able to accomplish that after some time.

When questioned more directly whether he had previously acknowledged Dr. Pannu to be sole inventor of the subject lenses Dr. Link was less than forthright:

Q. In this license agreement under that witnesseth, are you acknowledging that all other information relating to intraocular lenses disclosed and claimed in U.S. patent 4435855 is that of Doctor Pannu?

A. Again, it reads clearly well. You want me to further interpret?

Q. No. I am simply asking you whether you considered that to be an acknowledgment that Doctor Pannu is the owner of that information?

A. It states clearly that the licensor, Doctor Pannu, has developed designs, methods, processes and other information, yes.

Q. You consider that an acknowledgment by you and your company that Doctor Pannu is the owner of technology, do you not?

A. Well, I think it was clearly intended in the document, and it was signed by me.

For the next five questions on the subject Dr. Link continues the evasive responses essentially saying only that the document is what the document says it is. He did admit, however, that the position later taken—that Dr. Pannu is the sole owner of the 4435855 patent—is a change from the position held by his attorney in February 1984 before a licensing agreement was reached.

It is significant that Dr. Link has not made a claim in this lawsuit that he is a co-inventor. It is the defendant Iolab which seeks to invalidate the patent by doing that which Dr. Link himself probably could not do: show that Dr. Link is a co-inventor. On the record before the court Dr. Link or any of his employees at Heyer–Schulte would be estopped. When queried on the subject Dr. Link's answers reveal an understanding of the legal and equitable obstacles:

Q. Have you ever made a formal claim to the patent office or any court that you consider yourself to be a joint inventor of the matter that is claimed in Dr. Pannu's patent?

A. I have not made a claim in the patent office that I am a joint inventor. When you broaden that to say in any

court, I think in the testimony in this matter earlier, this issue of joint inventorship has been discussed. I don't want to misrepresent my reply.

Q. Have you ever initiated a proceeding to have yourself named a joint inventor?

A. I have not.

Randall Bailey ("Bailey"), who worked for Dr. Link at Heyer–Schulte as marketing and sales director, gave remarkable testimony as to the origin and purpose of the co-inventorship claim:

Q. Are you aware that in the process of negotiations there was an assertion made to Doctor Pannu that Doctor Link might be a joint inventor of his invention?

A. Yes. I recall something to that effect?

Q. Do you know why that assertion was made?

A. We kind of developed a strategy that said that we would play hardball and it was time to get the thing signed or not, and we used as part of the strategy the assertion that Doctor Link was a co-inventor to try to force Doctor Pannu to sign the agreement.

Q. Other than in that letter, are you aware of any other time or any other claim that Doctor Link said that he was a joint inventor of the original Pannu invention that is reflected on the lens shown on display?

A. Not subsequent to that, no.

That testimony stands unchallenged in this record.

Dr. Link left Heyer–Schulte in 1989 to start his own firm five years after consummating the licensing agreement with Dr. Pannu. That new firm, Kiron, acquired the defendant corporation, Iolab. Dr. Link was president of Kiron and a shareholder when this lawsuit commenced in 1993. The claim of a joint inventorship was resurrected in 1989 after Dr. Pannu told Dr. Link that Dr. Link's new company was one of those still infringing on his patent. According to Dr. Pannu, Dr. Link asked him to instruct his attorney to write

him a strong letter, and that they could negotiate a licensing agreement whereby Dr. Link would pay two to three percent royalties, prospectively. Dr. Pannu complied. What followed is consistent with Dr. Link's 1984 hardball strategy:

Q. In response you received a letter from Doctor Link's attorney stating that he was a joint inventor and that letter has been introduced earlier in this proceeding, is that correct?

A. That letter was an absolute shock, an about turn for me. Because at no time in hours of meeting I had that day with Doctor Link, in the private lunch, just him and me, he never said make me a co-inventor, I will not pay you. I want my name on it. Never. Not once he brought it up.

Q. Did Doctor Link ever take any steps to change the inventorship of your patents?

A. He never brought it up before.

Although counsel for Iolab contended at trial that Dr. Link's contribution to Dr. Pannu's invention was "the concept of making this lens one piece construction," Dr. Link never claimed that single piece construction of IOL was novel or that he was the inventor of the process by which Dr. Pannu's lenses were manufactured. On the history of single piece lens construction he noted:

When we made single piece lenses before tumble polishing, they were out of a blank, and shaped and then polished in the similar way so we could not make the small flexible haptics and we came up with a way to be able to polish the entire lens, including the optic and the haptics without breaking the haptics, and also without interfering with the high quality optical component.

Tumble polishing, the technique used in the final stage of single-piece lens construction, was an old process used in polishing gems which, allegedly, was refined by Dr. Link's employer AHS for use in lens production. Dr. Link explained the

rather unsophisticated methodology as he understood it:

> We got the idea or thought of how do you polish gems and stones that polished on all surfaces simultaneously. So tumble polishing is the process where actually in a container you put a number of these lenses and then with a slurry mixture of water, possibly and polishing compounds and so forth and some beads and other things and we figured out over quite a while, a combination of processes that would allow us to tumble polish the lens, not break the haptics when they were nice and thin, and also have a good optical performance that opened up a whole new era in lens design, the ability to make single piece lenses with flexible haptics. Prior to that, single piece lens had fairly stiff haptics.

From October 1980, to the date of retrial on the issue of inventorship, Dr. Link did not initiate any proceeding to correct the patent or to have himself named as an inventor of the invention claimed in the '525 (successor to the original patent no. 4,435,855).

## DISCUSSION

### Dr. Link's Contribution to Invention Lacks Significance

Because courts presume patents to correctly name the inventors, claims of improper inventorship are "subjected to the closest scrutiny." *Amax Fly Ash Corp. v. United States,* 206 Ct.Cl. 756, 514 F.2d 1041, 1047 (1975) *quoted in The Barbed Wire Patent,* 143 U.S. 275, 285, 12 S.Ct. 443, 36 L.Ed. 154 (1892). "Such defenses are highly technical; courts disfavor these defenses on the strength of the legal presumption that the inventors named in a patent are the true ones." *General Motors Corp. v. Toyota Motor Co.,* 667 F.2d 504, 507 (6th Cir.1981), *cert. denied,* 456 U.S. 937, 102 S.Ct. 1994, 72 L.Ed.2d 457 (1982).

▮ A person shall be entitled to a patent unless he did not himself invent the subject matter sought to be patented. 35 U.S.C. § 102(f). Since the word "he" refers to the specific inventive entity named on the patent, this subsection mandates that a patent accurately list the correct inventors of a claimed invention. *Pannu,* 155 F.3d at 1348–49. Conception is the touchstone to determining inventorship. *Fina Oil and Chem. Co. v. Ewen,* 123 F.3d 1466, 1473 (Fed.Cir.1997). Conception is complete when one of ordinary skill in the art could construct the apparatus without unduly exhaustive research or experimentation. *Sewall v. Walters,* 21 F.3d 411, 415 (Fed.Cir.1994).

Iolab contends that the '525 patent is invalid because Dr. Link is a joint inventor of the subject matter of the patent, yet the patent names only Dr. Pannu as the sole inventor.

▮ Inventors may apply for a patent jointly even though (1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, or (3) each did not make a contribution to the subject matter of every claim of the patent. 35 U.S.C. § 116. A joint invention is the product of a collaboration between two or more persons working together to solve the problem addressed. *Burroughs Wellcome Co. v. Barr Lab., Inc.,* 40 F.3d 1223, 1227 (Fed.Cir.1994). A joint inventor must contribute in some significant manner to the conception of the invention. *Ewen,* 123 F.3d at 1473. A person will not be a joint inventor if he or she does no more than explain to the real inventors concepts that are well known and the current state of the art. *Hess,* 106 F.3d at 981.

▮ Under the facts shown, no reasonable juror could find convincing, Iolab's proof that Dr. Link is a joint inventor. The concept of single piece construction was inherent in Dr. Pannu's original patent application, and was recognized by the PTO in its Office Action dated November 18, 1980. Although single piece construction was not specifically disclosed in the original application, a claim to "an intraocular lens" necessarily encompasses any

IOL that meets the other language of a claim, without regard for whether it is made from a single piece or multiple pieces. The invention claimed in claim 10, which depended from claim 1, was found to cover a lens made in a single piece construction.

Dr. Link's suggestion, that his company could manufacture the lens in one piece, did not contribute anything of significance to Dr. Pannu's original invention. It did nothing more than inform Dr. Pannu of the current state of the manufacturing art, and suggest a narrowing of his originally conceived invention to an embodiment that Heyer–Schulte wanted to manufacture. Indeed, any employee of Heyer–Schulte could have provided Dr. Pannu with the same information, and it would have been obvious to such a person to do so. The basic exercise of the normal skill expected of one skilled in the art, without an inventive act, does not make one a joint inventor. *Ewen,* 123 F.3d at 1473. Dr. Link's suggestion was not significant to the conception of Dr. Pannu's invention.

■ To be a joint inventor, an individual must not only make a significant quantum of inventive contribution to the conception of the claimed invention, but the contribution must also be significant in quality when that contribution is measured against the dimension of the full invention. *Ewen,* 123 F.3d at 1473. As measured against the dimension of Dr. Pannu's full invention, Dr. Link's suggestion was not significant in quality. The invention was for an IOL that is resistant to snagging when being implanted into or extracted from an eye. Substantially all of the claim language of the main independent claim, claim 1, is directed to describing the shape, orientation, and flexibility of the haptics and the "means" located at the ends of the haptics for resisting snagging. A single phrase, referring to haptics "integrally formed with said lens body as a one-piece construction" (Col. 4, lines 20–21 of

the '525 patent), is the sole reference to single piece construction. Considering that the purpose of the invention is to reduce snagging, and that that purpose is accomplished with a lens that meets claim language dictating spacing, flexibility, positioning, curvature, size, and coplanarity, the limitation that the lens be of single piece construction is not a requirement that enhances snag resistance, and cannot be considered a significant feature.

### No Inventive Collaboration

■ A joint invention is the product of collaboration of the inventive endeavors of two or more persons working toward the same end and producing an invention by their aggregate efforts. To constitute a joint invention, it is necessary that each of the inventors work on the same subject matter and make some contribution to the inventive thought and to the final result. *Kimberly–Clark Corp. v. Procter & Gamble Distrib. Co., Inc.,* 973 F.2d 911, 916 (Fed.Cir.1992). Prior to the meetings of October 25 and 26, 1980, there had been no collaboration between Dr. Pannu and Dr. Link. The two met then to discuss the possibility that Dr. Link's company might manufacture Dr. Pannu's lens pursuant to a license. Neither was an employee of the other. At the time of their meeting they had not formed any business or working relationship. The "end" toward which they were working was to establish a business relationship pursuant to which Heyer–Schulte would manufacture Dr. Pannu's lens. Because Dr. Pannu's then—pending patent application included claims that covered the lens Heyer–Schulte intended to make, there was no incentive to "improve" the invention or to "solve" some unidentified problem. According to Dr. Link, "I was thinking about lens design and how to make Doctor Pannu's lens." Dr. Pannu's recollection was that the meeting was "social." According to Dr. Pannu, they discussed lenses Dr. Link had made for Dr. Kelman,[1] the royalties Dr. Pannu could

---

1. Interestingly, the one-piece Kelman lens was also manufactured by Dr. Link's company AHS, using its secret tumble-polishing pro-

cess. No claim was made by Dr. Link or his company to a co-inventorship in or invalidity of Kelman's patented device even though

expect to be paid, what is involved in getting patents, and what is involved in manufacturing an IOL. Dr. Pannu's recollection is fully supported by Dr. Link's October 28, 1980 memorandum.

Throughout the meeting of October 25 and 26, Dr. Link and Dr. Pannu did not collaborate to create or improve an invention. The "end" they were seeking was simply a business goal. They were not working to change or improve the design claimed in Dr. Pannu's pending patent application, they had identified no problem they were attempting to solve, and they did not collaborate their inventive endeavors toward the same end to produce an invention by their aggregate efforts. In the absence of convincingly clear evidence of inventive collaboration, no reasonable jury could find that Dr. Link is a joint inventor.

*Laches and Equitable Estoppel*

 Laches and equitable estoppel are recognized as defenses that may be asserted against a claim of joint inventorship. *MCV, Inc. v. King–Seeley Thermos Co.*, 870 F.2d 1568 (Fed.Cir.1989); *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157 (Fed. Cir.1993). Dismissal of a claim on the ground of laches requires that there be (1) unreasonable and unexcused delay in bringing the claim, and (2) material prejudice to the defendant as a result of the delay. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed.Cir.1992) *en banc.* Equitable estoppel may be applied to bar a claim where the following three elements are found: (1) the party making the claim has, through misleading conduct, led the non-claiming party to reasonably infer that the claimant does not intend to enforce his claim—"conduct" may include specific statements, action, inaction, or silence where there is a duty to speak; (2) the non-claiming party relies upon that conduct; (3) due to his reliance, the non-claiming party will be

materially prejudiced if the claiming party is allowed to proceed with his claim. *Id.* at 1029. Laches and equitable estoppel are defenses addressed to the sound discretion of the trial court. *Id.* at 1041.

 The evidence presented at trial establishes convincingly that Dr. Link waived, and would be estopped to raise, any claim he might have had to be named as a joint inventor on the '525 patent. Dr. Link instructed AHS's patent attorney. Barger, to prepare Dr. Pannu's C–I–P application. Although Dr. Link could not recall whether he had actually seen the completed application, he had the opportunity to do so, and the testimonial evidence given by Bailey and Dr. Pannu, along with Dr. Link's own expectations as stated in a telephone transcript, suggest that he did see the completed application. In any event, the claims drafted by Barger were later amended during prosecution of the patent, and Dr. Link learned of them shortly after Dr. Pannu's attorney, Grossman, included the approved claims in a December 1, 1983, letter to Dr. Link's patent attorney, Myers. On January 30 and February 3, 1984, with Dr. Link's knowledge and approval, Myers sent two letters to Grossman in which he acknowledged receiving the approved application and asserted that Dr. Link was a joint inventor of the Pannu lens. The February 3 letter stated, "[i]n the interest of a fair and equitable working relationship with Dr. Pannu, we have intentionally avoided asserting this position." Thereafter, in June and July, 1984, Dr. Link and Dr. Pannu executed a license agreement acknowledging Dr. Pannu's ownership of his patent. Dr. Link knew that the license represented a change in the position asserted in Myers' letter, and intentionally refrained from asserting that position. His execution of the license was a legal act that bound his company to the terms of the license. AHS paid royalties to Dr.

---

knowledge of the manufacturing process was not shared with Kelman or disclosed as part

of the invention.

Pannu under the license for a number of years.

From the date the C–I–P application was filed, on May 8, 1981, to the present, Dr. Link has never taken a single step to have himself named a joint inventor of Dr. Pannu's single-piece lens. Although he did, in February, 1989, raise the issue of inventorship in a letter to Grossman, he never initiated a proceeding that could have resulted in his being named a joint inventor. In any event, by 1989, five years had elapsed since he first raised the issue through his patent attorney, Myers, and Dr. Link might even then have been estopped to bring an action to correct the patent. *See MCV*, 870 F.2d at 1571–74 (equitable estoppel is a bar to action after omitted inventor had not acted to correct patent for four years after becoming aware of patent).

In the meantime, Dr. Pannu, in reliance upon his sole inventorship and ownership of the patent, participated in additional proceedings to have his patent reissued and reexamined, and brought civil actions (now settled) based upon claims of infringement. In addition, Dr. Pannu twice submitted to the PTO all evidence provided by Myers which Dr. Link could have relied upon in support of the proposition that he was a joint inventor. Short of actually initiating a declaratory judgment proceeding against Dr. Link to determine inventorship, Dr. Pannu did everything he could to bring the issue to a conclusion. Dr. Pannu has materially changed his position in reliance upon Dr. Link's having acknowledged Dr. Pannu's ownership of the patent by signing the license agreement and by taking no other action to assert a claim of joint inventorship.

 A claimed co-inventor, who is estopped to challenge the validity of a patent, may not circumvent the equitable bar by having the joint inventorship issue raised as an affirmative defense in an infringement action brought against a corporation in which he has an ownership interest. *See* 35 U.S.C. § 111 (rights granted by a patent belong to the inventor). A finding that a claimed co-inventor has waived the patent right, or is otherwise equitably estopped to claim the right, is binding on third parties.

It would be grossly inequitable, at this late date, to permit Dr. Link to be named a joint inventor of the '525 patent. The consequences to Dr. Pannu, if Dr. Link has not waived his right to be a joint inventor, could include the invalidation of Dr. Pannu's patent if a jury found that the best mode contemplated by Dr. Link was not disclosed in the patent. Further, assuming that the patent is not invalidated, but Dr. Link is named a joint inventor, then he would become an equitable owner of the patent and could, by simply refusing to join Dr. Pannu as a plaintiff in subsequent litigation, deny Pannu the ability in the future to enforce the patent against infringers. *See Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456 (Fed.Cir.1998) (co-inventor's refusal to join as plaintiff required dismissal of suit).

## CONCLUSION

Iolab's factual presentation in support of the co-inventorship affirmative defense falls far short of the clear and convincing proof needed to overcome the presumption that the named inventor on an issued patent is correct.[2] Dr. Link is not a joint inventor of the invention claimed in the '525 patent. Accordingly, Iolab's affirmative defense, that the '525 patent is invalid under 35 U.S.C. § 102(f) for failing

**2.** Iolab's strategy in this new trial was one of obfuscation. By one of four baseless pretrial motions Iolab sought to preclude the presentation of evidence on waiver and estoppel. Notwithstanding early admonishments by the Court that the narrow issue was joint inventorship, Iolab persisted in efforts to have the jury consider invalidity issues that had been already decided. At one point the Court was moved to note on the record that this jury "is overwhelmed". After the case had been taken from the jury by judgment as a matter of law, Iolab filed a post-trial motion to poll the jurors—perhaps to determine whether it had succeeded in the strategy.

to name the proper inventive entity, is dismissed. This court finds further that the claim of co-inventorship, raised first as bargaining tool in negotiations for a license and asserted in this litigation with a similar motive, has resulted in enormous costs to the plaintiff and waste of judicial resources. Dr. Pannu's judgment of June 12, 1997, shall be reinstated with adjustments for any sales of infringing devices made after that date, plus prejudgment interest and costs. Dr. Pannu shall have sixty (60) days from the date of this Order to conduct discovery to determine the number of additional sales of lenses made by the defendant, and to move for costs and other adjustments to the judgment.